**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

Filed
Washington State
Court of Appeals
Division Two

June 13, 2023

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>PHILLIP RENELLE JARVIS,<br><br>Appellant. | No. 56086-1-II<br><br><br><br>PUBLISHED OPINION |

Cruser, J. - Phillip Renelle Jarvis appeals his jury trial convictions for three counts of first degree assault and one count of first degree unlawful possession of a firearm and his life without parole sentence under the "Persistent Offender Accountability Act"[1] (POAA). He argues that (1) the superior court violated his constitutional rights by forcing him to repeatedly appear in restraints at 23 pretrial hearings and his sentencing hearing without first conducting the required individualized assessment, (2) the jury instructions read as a whole required the State to prove that he intended to assault the victims named in counts II and III and there was insufficient evidence of this element, (3) the prosecutor committed misconduct during closing argument by arguing facts outside of the record and by encouraging the jury to convict him on an improper basis, (4) the POAA is unconstitutional because it is administered in a racially disproportionate manner, (5) the

---

[1] RCW 9.94A.570.

No. 56086-1-II

POAA is categorically unconstitutional, and (6) the POAA is unconstitutional because it violates the proportionality doctrine.

We hold that (1)(a) Jarvis has demonstrated that he was improperly shackled at his sentencing hearing and the State fails to establish beyond a reasonable doubt that this improper restraint was harmless, (1)(b) the remainder of Jarvis' shackling arguments fail either because the State shows beyond a reasonable doubt that any potential improper restraint was harmless or because Jarvis does not establish on this record that he was restrained, (2) the jury instructions did not require the State to prove that he intended to assault the victims named in counts II and III, therefore we need not reach the sufficiency argument, (3) Jarvis fails establish that the prosecutor's arguments were improper or overcome waiver as to his prosecutorial misconduct claims, and (4) Jarvis' POAA arguments may be raised at resentencing. Accordingly, we vacate the sentences and remand for a full resentencing hearing at which Jarvis may also present his arguments regarding the constitutionality of the POAA. We otherwise affirm.

FACTS

I. BACKGROUND

On the night of October 5, 2018, a group of friends and acquaintances gathered at Jason Ashworth and Diane Cooper's backyard bar to socialize and drink. Everyone there had either been drinking at the backyard bar all evening or had arrived after drinking at a nearby pub.

In the early morning hours of October 6, Jarvis was asked to leave following a dispute with some of the others present. Jarvis left, but he quickly returned and shot into the bar approximately six times, hitting Micah Phillips, William Capers, and Stephen Jones. Phillips and Capers were injured; Jones' phone stopped the bullet.

2

No. 56086-1-II

## II. PROCEDURE

### A. CHARGES

On October 12, 2018, the State charged Jarvis with three counts of first degree assault and one count first degree unlawful possession of a firearm. Count I was for the assault of Phillips, count II was for the assault of Jones, and count III was for the assault of Capers. The State also filed a persistent offender notice, advising Jarvis that if he was convicted of or pleaded guilty to first degree assault, he would be classified as a persistent offender because he had previously been convicted of two most serious offenses and, thus, would be subject to a sentence of life without the possibility of parole.

### B. PRETRIAL PROCEEDINGS

Jarvis identifies 23 pretrial hearings that occurred between October 12, 2018, and the start of Jarvis' trial in April 2021. None of the pretrial hearings in this case were conducted by the judge who eventually conducted the trial and sentencing hearing.

The only record suggesting that Jarvis was restrained at any of these hearings is a notation on the order issued following the October 12, 2018 probable cause and bail hearing stating that Jarvis was unable to sign the order because he was "shackled." Clerk's Papers (CP) at 222.

On March 23, 2020, in the midst of these pretrial hearings, the Acting Presiding Judge of the Pierce County Superior Court issued Emergency Order 20-09 (Emergency Order #9)[2] addressing the emerging public health emergency caused by the COVID-19 pandemic. Emergency

---

[2] Emergency Ord. No. 20-09, *Public Health Emergency Order Regarding Pierce County Corrections Restraint Procedures* (Pierce County Superior Ct., Wash. Mar. 23, 2020), https://www.courts.wa.gov/content/publicUpload/COVID19_Pierce/Pierce%20County%20Super ior%20Court%20Emergency%20Order%20_9_0001.pdf [https://perma.cc/QT6Q-M35M].

3

No. 56086-1-II

Order #9 stated that in an attempt to reduce close contact between jail staff and in-custody defendants and to protect both staff's and the defendants' health in light of the "existing emergency conditions," jail staff who transported in-custody criminal defendants were "not required to change restraints in order to escort a defendant into courtrooms." Emergency Order #9, at 1-2. This order was effective until "April 24, 2020, unless specifically addressed by the Pierce County Superior Court Presiding Judge." *Id.* at 2. On July 29, 2020, the superior court extended Emergency Order #9 until further notice of the court. Revised Emergency Order 20-18,[3]

C. TRIAL

1. JURY SELECTION AND RELEVANT TRIAL TESTIMONY

The jury trial began on April 12, 2021.

During voir dire, the State questioned the prospective jurors about things that could affect a person's memory. The State asked the prospective jurors if anyone had experienced being "in an accident or . . . a fight, something that was really adrenaline charged," and then questioned individual jurors about how such situations affected their memory of such an event. Verbatim Rep. of Proc. (VRP) (Apr. 12, 2021) at 42. The State then asked the prospective jurors if they would expect that "everyone who's in an adrenaline-charged situation will remember everything or the opposite." *Id.* at 43-44. Several of the prospective jurors responded that they would not expect everyone to remember such an event the same way. And when the State asked if any of the

---

[3] Emergency Ord. No. 20-18, *Public Health Emergency Order Regarding Pierce County Corrections Restraint Procedures (Amending Emergency Order #9)* (Pierce County Superior Ct., Wash. July 29, 2020), https://www.courts.wa.gov/content/publicUpload/COVID19_Pierce/Pierce%20County%20Superior%20Court%20Revised%20Emergency%20Administratvice%20Order%2020-18.pdf [https://perma.cc/EL4R-6XFH].

4

No. 56086-1-II

prospective jurors did not agree that such a situation could impact someone's memory of an event, none of the jurors responded.

At trial, the witnesses testified as described above. In addition, several of the witnesses identified Jarvis as the shooter in the courtroom and in photographic lineups.

2. JURY INSTRUCTIONS

The superior court provided the jury with to-convict instructions for each charge. The superior court also defined assault, and instructed the jury that under certain circumstances, a defendant's intent to assault one person could be transferred to another person. Jarvis did not object to these instructions. These instructions are set out in full in section II of the analysis.

3. CLOSING ARGUMENTS

In its closing argument, the State argued that the key issues were whether it was Jarvis who had fired the shots and whether he intended to inflict great bodily harm.

During its argument, the State acknowledged that when the shooting happened, "everyone at the . . . [b]ar had been drinking" and everyone was intoxicated to different degrees. VRP (May 11, 2021) at 60. The State also attempted to explain why some witnesses might have remembered the events differently by acknowledging that most of the witnesses were not paying particular attention to what was going on around them and asserting that others' memories might be different due to having been involved in a traumatic event.

Specifically, the State argued:

This night, I submit to you it's clear no one paid any undue attention to what they were doing or what others were doing, because it's something they had done countless times before. No one expected trouble. No one was on alert. No one was hypervigilant to their surroundings or to the people around them. No one was paying particular attention to anything or anyone, because they had no reason to. No one was expecting anything to happen. Imagine having to describe something

5

No. 56086-1-II

after the fact that you didn't know you were going to have to describe, like who you were talking to before something happened and how much you had to drink. There was no reason to keep track of these things or to even notice them, because they didn't expect trouble.

Everyone also had their own perspectives. This was a relatively large group of people in a relatively small space. Their perspectives would have been different depending where they were seated or standing, who they were talking to, what they were doing, and, yes, how much they had to drink. But they were all in different areas experiencing different things. Some people didn't even notice that [there] was anything going on for quite some time. But then there were gunshots in place where they didn't expect to hear gunshots. And for [Phillips] having a gun pulled on him, right in front of him, w[h]ere he didn't expect that to happen. Surprising. I submit to you, frightening.

But, again, remember what this atmosphere was like when you're reflecting on, well, people said different things, people remembered things differently, and they were all drinking. Yes, all true. But everybody was certain about this defendant. Everyone knew that there was a gun. The people that saw the gun saw it in his hand.

And that there was a very good and valid reason why other things might be confusing. They had no reason to commit anything to memory. *And when something chaotic like this is happening -- remember it came up in voir dire. There's no reason they would remember things, details that happened leading up to this event at all, because they had no reason to remember them. But people remember traumatic events differently. It affects them differently.* And, again, everyone had their own perspectives wherever they were. Some people tried to help [Capers] and [Phillips]. Others went outside. And [two witnesses] left. . . . I mean, there are reasons why you can't expect everyone to have the same exact memory.

*Id.* at 66-68 (emphasis added). Jarvis did not object to this argument.

At the end of its closing argument, the State argued,

All of the evidence that you've heard at this trial points directly to the defendant. *Please hold him responsible for these actions*. For losing his temper, for pulling a gun where he did not need to so at a gathering of friends. *Hold him responsible* for the injuries suffered by [Phillips] and [Capers]. They were hurt. [Phillips] had part of his intestines removed because of the defendant's actions.

*Hold him responsible for that*, and find him guilty as charged. Thank you.

*Id.* at 77 (emphasis added). Jarvis did not object to this argument.

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56086-1-II

The jury found Jarvis guilty of all three first degree assault charges and the first degree unlawful possession of a firearm charge.

D. SENTENCING

At sentencing, the State argued that because Jarvis had prior convictions for a 1994 second degree assault and a 1998 first degree assault, the court had no discretion but to impose life without parole sentences for the current first degree assault convictions. Regarding the first degree unlawful possession of a firearm conviction, the State requested an 89-month sentence, which was at the top of the standard range for that offense based on Jarvis' offender score.

The State presented fingerprint comparison evidence and photographs demonstrating that Jarvis was the defendant in the 1994 second degree assault case and the 1998 first degree assault case. Jarvis objected to the admission of the fingerprint comparison report and briefly questioned the witness who wrote the report about the comparison process. The court admitted the fingerprint comparison report.

Jarvis' counsel argued that a life sentence based on a second degree assault for which Jarvis served "a couple of months on," was not "acceptable." VRP (Aug. 12, 2021) at 44. But Jarvis did not contend that the sentence was disproportionate or racially biased or attempt to present any evidence to support such claims. And counsel did not otherwise challenge the POAA sentencing. Jarvis' counsel did not request any sentence for the first degree unlawful possession of a firearm conviction or respond to the State's request for an 89-month sentence.

The superior court found that Jarvis had been convicted for a 1994 second degree assault and a 1998 first degree assault, that these prior offenses had not washed out, and that these convictions were strike offenses. Accordingly, the superior court sentenced Jarvis to life in prison

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56086-1-II

as a persistent offender. The court also sentenced Jarvis to 89 months for the first degree unlawful possession of a firearm conviction and ran this sentence concurrent to the other sentences.

### III. NOTICE OF APPEAL AND ADDITIONAL RECORD

Jarvis appealed his convictions and his sentence.

In his original opening brief, Jarvis attached a declaration from a private investigator who had interviewed jail staff about the jail restraint procedures and a declaration from Jarvis stating that he had been restrained at several pretrial hearings and at sentencing. Jarvis moved to "expand the appellate record" to include the two declarations under RAP 9.11 and RAP 1.2. Mot. to Expand Appellate R. (July 5, 2022). The State argued that neither declaration could be considered as supplemental evidence that could be added to the record under RAP 9.11 because they related to facts that were outside the record.

Commissioner Schmidt "added" Jarvis' declaration to the appellate record under RAP 9.11. Comm'r's Ruling (July 21, 2022). He also denied Jarvis' motion as to the private investigator's declaration and the State's motion to strike portions of Jarvis' brief. But the commissioner further ruled that the State could "address its concerns in its brief." *Id.* Neither party moved to modify the commissioner's ruling.

### ANALYSIS

### I. RESTRAINTS

Jarvis first argues that the superior court violated his constitutional rights by forcing him to appear in restraints at 23 pretrial hearings and at his sentencing hearing without first conducting the required individualized inquiry into whether restraints were necessary. Jarvis also argues that

8

No. 56086-1-II

the State cannot establish beyond a reasonable doubt that the unconstitutional use of restraints was harmless.

The State concedes that Jarvis was subject to unconstitutional restraint at the October 12, 2018 hearing and at his sentencing hearing.

We hold that (1) Jarvis establishes that he was unconstitutionally restrained at sentencing and that the State fails to show beyond a reasonable doubt that this error was harmless, (2) the State establishes beyond a reasonable doubt that the unlawful use of restraints at the October 12, 2018 hearing was harmless, and (3) Jarvis fails to establish on this record that he was restrained at the remaining hearings.

A. LEGAL PRINCIPLES

A defendant's right to a fair trial is protected by the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution.[4] *State v. Jackson*, 195 Wn.2d 841, 852, 467 P.3d 97 (2020). This right entitles a defendant to appear at "every court appearance," including nonjury proceedings, " 'free from all bonds or shackles except in extraordinary circumstances.' " *Id.* at 852, 854 (quoting *State v. Finch*, 137 Wn.2d 792, 842,

---

[4] Amici American Civil Liberties Union of Washington Foundation, Fred T. Korematsu Center for Law and Equality, Disability Rights Washington, and Washington Defender Association, have filed an amicus brief describing the long history of the use of shackling as a form of oppression and discussing the effects of shackling in the courts on defendants and judges. Amici argue that, particularly when there are blanket orders permitting restraints in the courts, the courts should apply the more stringent constitutional harmless error standard rather than the less stringent nonconstitutional harmless error test and that the State cannot establish harmless error in this case.

We agree that the constitutional harmless error standard applies here, and we acknowledge "that . . . the systemic control of persons of color remains in society, particularly within the criminal justice system." *State v. Jackson*, 195 Wn.2d 841, 851, 467 P.3d 97 (2020). But Amici's assertion that the State cannot show harmless error based solely on implicit bias is not persuasive; this issue requires more analysis than that provided by amici.

No. 56086-1-II

975 P.2d 967 (1999) (plurality opinion)). But a court has the discretion to require restraints in court if it first conducts an individualized inquiry into whether the use of restraints is necessary. *Id.* at 852-53.

Once an appellant demonstrates that he or she was unconstitutionally physically restrained during a court proceeding, the State must establish that any error was harmless. *Id.* at 855-56. In this context, "the State bears the burden to prove beyond a reasonable doubt that the constitutional violation was harmless as set forth in [*State v.*] *Clark*, 143 Wn.2d [731,] 775-76, 24 P.3d 1006 [(2001)]." *Id.* at 856. *Clark* provides that to establish harmless error, it must appear from an examination of the record that the error was harmless beyond a reasonable doubt or that the evidence against the defendant was so overwhelming that no rational finder of fact could find the defendant not guilty. 143 Wn.2d at 775-76. "The likelihood of prejudice is significantly reduced in a proceeding without a jury." *State v. Lundstrom*, 6 Wn. App. 2d 388, 395 n.2, 429 P.3d 1116 (2018); *State v. E.J.Y.*, 113 Wn. App. 940, 952, 55 P.3d 673 (2002).

B. APPLICATION

In his amended opening brief, Jarvis identifies 20 pretrial hearings that occurred before the superior court issued its emergency COVID-19 orders in mid-March 2020, and he asserts that he was restrained without the superior court first conducting an individualized inquiry as to whether restraints were justified at these hearings. He also identifies 3 pretrial hearings at which he asserts that he was unconstitutionally restrained that occurred after the emergency order #9 was issued. And he asserts that he was unconstitutionally restrained at his sentencing hearing.

No. 56086-1-II

The State concedes that Jarvis was restrained and that the superior court failed to engage in the required individualized inquiry before allowing him to be restrained at the October 12, 2018 hearing and at his sentencing.

1. UNCONSTITUTIONAL SHACKLING CONCEDED

a. OCTOBER 12, 2018 HEARING

Jarvis asserts that he was restrained without the superior court first conducting an individualize inquiry at the October 12, 2018 hearing, during which the court found probable cause and set bail and conditions of release. The State concedes that Jarvis was restrained without the court first conducting an individualized inquiry into whether restraints were necessary at this hearing. The notation on the October 12, 2018 order that Jarvis could not sign the order because he was shackled supports the State's concession.

Thus, Jarvis establishes that he was unconstitutionally restrained at the October 12, 2018 hearing, and we need only address whether the State can prove beyond a reasonable doubt that this admitted error was harmless. We hold that the State meets this burden.

At the October 12, 2018 hearing, a superior court commissioner found probable cause based on the declaration for determination of probable cause, set Jarvis' bail at $750,000, and established conditions of release. The record clearly supports the superior court's probable cause determination.

"Probable cause for arrest as it is normally understood is defined in terms of circumstances sufficient to warrant a prudent person in believing that the suspect has committed or was committing a crime." *State v. Parks*, 136 Wn. App. 232, 237, 148 P.3d 1098 (2006). Jarvis was charged with the first degree assaults of Phillips, Jones, and Capers and with first degree unlawful

No. 56086-1-II

possession of a firearm. The declaration for determination of probable cause describes the shooting, including that Jarvis was identified as the person who had intentionally shot into the group of people in the bar, hitting Phillips, Jones, and Capers. It also alleged that Jarvis used a gun to commit the assaults and that his criminal history included prior felony convictions. Because the facts in the declaration for determination of probable cause clearly support the commissioner's probable cause finding, the State shows beyond a reasonable doubt that Jarvis' appearance in restraints at this hearing did not contribute to this determination or, as neither jury nor the trial court saw Jarvis in restraints at this hearing, to the jury's verdict or his sentence in any way.

And as to the bail and conditions of release, in setting bail and establishing the conditions of release, the commissioner relied on the fact Jarvis "ha[d] four cases with warrant activity;" the fact his prior offenses were serious crimes, including first and second degree assault; and the fact his current offenses involved multiple first degree assaults caused by Jarvis' dangerous behavior of shooting at least six times into the group of people. VRP (Oct. 12, 2018) at 44. Given these facts, the commissioner's bail and conditions of release decisions were reasonable. Thus, the State has shown beyond a reasonable doubt that the unconstitutional restraint that occurred at the October 12, 2018 hearing was harmless because not only were the commissioner's decisions reasonable, but neither the jury nor the trial court saw Jarvis in restraints at this hearing so the fact he was in restraints could not have influenced the jury's verdict or his sentence in any way.

b. SENTENCING HEARING

The State also concedes that Jarvis was unconstitutionally restrained at his sentencing hearing. The State fails to establish beyond a reasonable doubt that the unconstitutional restraint was harmless. Accordingly, we reverse Jarvis' sentences and remand for resentencing.

12

No. 56086-1-II

As to the life sentences, the superior court based its conclusion that the State had proven the two prior strike offenses were committed by Jarvis on the fingerprint and photograph evidence.[5] Although the life sentences would be mandatory if the two prior strike offenses were proven, in determining whether this evidence established that Jarvis committed the prior offenses the superior court had to make factual determinations, evaluate witness credibility, and make its own comparisons of photographs to Jarvis. Given the nature of the evidence and the superior court's role in evaluating the evidence, the State cannot establish beyond a reasonable doubt that Jarvis' appearance in restraints at sentencing had no impact on the court's decision that Jarvis had committed the two prior offenses.

As to the sentence for the first degree unlawful possession of a firearm conviction, the superior court did have discretion. Because Jarvis' appearance in restraints at the sentencing hearing could have influenced the court's decision to sentence Jarvis at the top of the standard range, the State fails to establish beyond a reasonable doubt that Jarvis appearing in restraints was harmless.

Accordingly, we reverse Jarvis' sentences and remand for full resentencing at which Jarvis can raise any and all issues related to his sentencing.[6]

---

[5] We note that the State asserts that Jarvis stipulated to his prior offenses. The State mischaracterizes this stipulation. Jarvis stipulated to the prior serious felony offenses for the sole purpose of establishing the existence of the prior serious offense conviction element of the first degree unlawful possession of a firearm charge. In fact, the stipulation states that "[t]he stipulation is to be considered evidence only of the prior conviction element." CP at 49. Furthermore, the record clearly shows that the parties and the superior court did not rely on this stipulation to prove the existence of the prior strike offenses at the sentencing hearing.

[6] Jarvis also mentions that his appearance in restraints could have influenced the superior court's decision not to set conditions for release pending his appeal. Because we reverse the sentences, we do not address this issue.

No. 56086-1-II

2. OTHER PRETRIAL HEARINGS

Jarvis next asserts that he was unconstitutionally restrained at 22 additional pretrial hearings. The record is insufficient to allow us to review these claims.

It is Jarvis' initial burden to establish that he was unconstitutionally restrained, and he cannot do so on this record. *See Jackson*, 195 Wn.2d at 855-56 (examining whether error was harmless after first determining that the appellant established unconstitutional shackling). The clerk's papers and the reports of proceedings before us do not mention whether Jarvis was restrained at any of these 22 pretrial hearings. And, although Jarvis' declaration was accepted by our commissioner, we hold that the commissioner's acceptance of the declaration was in error and decline to consider it.

The commissioner accepted Jarvis' declaration under RAP 9.11, which permits us to "direct that additional evidence on the merits of the case be taken" if certain requirements are established. But Jarvis' declaration, which contains his assertions about whether he was shackled during certain hearings, is not "evidence on the merits of the case." RAP 9.11. Jarvis' declaration is, instead, an attempt to reconstruct an inadequate record, without providing an opportunity for the State to challenge the statements in the declaration, and it does not fall under RAP 9.11. Thus, the commissioner erred when he accepted Jarvis' declaration under RAP 9.11, and we will not consider it. We acknowledge that neither party moved to modify the commissioner's ruling. But we construe the language in the commissioner's ruling that permitted the State to "address its concerns in its brief," as an acknowledgement that this ruling could be challenged directly in the appeal. Comm'r's Ruling (July 21, 2022).

No. 56086-1-II

Because we hold that Jarvis fails to establish unconstitutional restraint at these 22 hearings based on this record, we do not examine whether any potential error was harmless with respect to these hearings. [7] If Jarvis has evidence from outside the record regarding whether he was restrained at any of these additional hearings, he can raise these issues in a personal restraint petition. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

---

[7] Jarvis also asserts that the Pierce County Jail has a blanket policy requiring all defendants facing conviction for a third strike to be restrained in belly chains and leg irons in all proceedings other than jury trials unless the court orders otherwise. But Jarvis' support for this assertion was the private investigator's declaration that was not admitted and his own declaration, which, as discussed above, we decline to consider. Accordingly, Jarvis' claim that there was a blanket policy is not supported by this record.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 56086-1-II

II. JURY INSTRUCTIONS AND SUFFICIENCY OF THE EVIDENCE OF ADDITIONAL ELEMENT

Jarvis next argues that reading the to-convict instructions for the assault counts related to Jones and Capers (counts II and III)[8] together with the jury instruction defining assault,[9] required the State to prove that he intended to shoot Jones and Capers and that the State failed to meet this burden. We disagree.

---

[8] These two to-convict instructions provided:

> To convict the defendant of the crime of assault in the first degree as charged in Count II, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about October 6, 2018 the defendant *assaulted* Stephen Jones;
> (2) That the assault was committed with a firearm, or a deadly weapon or by a force or means likely to produce great bodily harm or death;
> (3) That the defendant *acted with intent to inflict great bodily harm*; and
> (4) That this act occurred in the State of Washington.

CP at 61 (Jury Instruction 7) (emphasis added).

> To convict the defendant of the crime of assault in the first degree as charged in Count III, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about October 6, 2018 the defendant *assaulted* William Capers;
> (2) That the assault was committed with a firearm, or a deadly weapon or by a force or means likely to produce great bodily harm or death;
> (3) That the defendant *acted with intent to inflict great bodily harm*; and
> (4) That this act occurred in the State of Washington.

*Id.* at 62 (Jury Instruction 8) (emphasis added).

[9] Jury instruction 9 provided:

> An assault is an *intentional shooting of another person* that is harmful or offensive, regardless of whether any physical injury is done to the person. A shooting is offensive if the shooting would offend an ordinary person who is not unduly sensitive.
> An assault is also an act done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if not prevented. It is not necessary that bodily injury be inflicted.

*Id.* at 63 (Jury Instruction 9) (emphasis added).

16

No. 56086-1-II

"[C]onstitutional due process requires that the State prove every element of the [charged] crime beyond a reasonable doubt." *State v. France*, 180 Wn.2d 809, 814, 329 P.3d 864 (2014). Jury instruction not objected to become the law of the case, and the State has the burden of proving any additional elements included in such instructions. *State v. Johnson*, 188 Wn.2d 742, 755, 764-65, 399 P.3d 507 (2017). We "review [ ] challenged jury instruction[s] de novo, within the context of the jury instructions as a whole." *State v. Jackman*, 156 Wn.2d 736, 743, 132 P.3d 136 (2006).

Jarvis contends that because the to-convict instructions for counts II and III required the jury to find that he assaulted Jones and Capers, and the instructions defined assault as an *intentional* shooting of another, the jury could only convict him of counts II and III if it found that he had intentionally shot Jones and Capers.

Even if Jarvis were correct that the to-convict instructions for counts II and III read in conjunction with the instruction defining assault required the State to prove that he intended to shoot Jones and Capers, this argument fails because Jarvis ignores jury instruction 13.[10]

Jury instruction 13 provided,

> If a person acts with intent to assault or cause great bodily harm to another, but the act harms a third person, the actor is also deemed to have acted with intent to assault or cause great bodily harm to the third person.

CP at 67. So, even if the State had to prove that Jarvis intentionally shot Jones and Capers, jury instruction 13 would permit the jury to deem Jarvis to have acted with intent to shoot Jones and Capers if it found that Jarvis acted with intent to shoot Phillips. And Jarvis does not assert that the

---

[10] Although Jarvis suggests that the doctrine of transferred intent does not apply to an unintentional shooting, Jarvis does not mention jury instruction 13 or argue that jury instruction 13 was improper.

17

No. 56086-1-II

evidence was insufficient to prove that he acted with intent to shoot Phillips or with intent to inflict great bodily harm upon Phillips.

Because the jury instructions as a whole did not require the State to prove that Jarvis intended to shoot Jones and Capers, this argument fails.

### III. PROSECUTORIAL MISCONDUCT

Jarvis further argues that the prosecutor committed misconduct during closing argument by arguing facts outside the record and by encouraging the jury to convict him on an improper basis. Specifically, he argues that (1) the prosecutor's reference to the effect of trauma on memory was argument based on facts outside the record, and (2) the prosecutor's plea to the jury to hold Jarvis responsible was an improper argument that appealed to the jury's passion and prejudice. Because Jarvis does not show that these arguments were improper and fails to show that the alleged misconduct, to which he did not object, was so flagrant and ill-intentioned that it could not have been cured, we reject these arguments.

### A. LEGAL PRINCIPLES

To establish prosecutorial misconduct, Jarvis must show that the prosecutor's conduct was both improper and prejudicial in the context of all the circumstances of the trial. *State v. Zamora*, 199 Wn.2d 698, 708, 512 P.3d 512 (2022). Because Jarvis failed to object to the alleged misconduct at trial, a heightened standard of review requires him to show that any alleged misconduct was " 'so flagrant and ill intentioned that [a jury] instruction would not have cured the [resulting] prejudice.' " *Id.* at 709 (alteration in original) (internal quotation marks omitted) (quoting *State v. Loughbom*, 196 Wn.2d 64, 70, 470 P.3d 499 (2020)). The focus of this heightened standard is whether an instruction would have cured the prejudice. *State v. Crossguns*, 199 Wn.2d

18

No. 56086-1-II

282, 299, 505 P.3d 529 (2022). If Jarvis fails to make this showing, the prosecutorial misconduct claim is waived and we need not consider its merits.

B. ALLEGED REFERENCE TO FACTS OUTSIDE THE RECORD

A prosecutor commits misconduct during oral argument by arguing facts not in evidence. *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 705, 286 P.3d 673 (2012). Jarvis argues that the State committed prosecutorial misconduct by arguing facts outside the record when it attempted to explain any discrepancies in the intoxicated witnesses' testimonies by arguing that their lack of memory was due to trauma rather than their alcohol consumption when there was no evidence presented at trial regarding whether trauma could affect memory.

Although Jarvis is correct that there was no evidence presented regarding whether trauma could affect memory, the State's argument was not that the discussion during voir dire was evidence. Instead, taken in context, it was a reference to the fact that individual witnesses will remember events differently for a variety of reasons. The prosecutor also commented at length about the multiple other reasons the witnesses could have conflicting or imperfect memories of the shooting, including that they had been drinking, that they were not paying attention, and that they were all viewing the incident from different perspectives. This argument was simply an appeal to the jury to use their common sense when evaluating the inconsistencies in the witnesses' testimonies.

Furthermore, even if this argument was improper, Jarvis does not argue, let alone show, that this allegedly improper argument was so flagrant and ill-intentioned that a curative instruction would not have cured any potential prejudice. Jarvis argues only that there is a substantial likelihood the misconduct led the jury to convict on an impermissible basis. We hold that a curative

19

No. 56086-1-II

instruction would have cured any potential prejudice. Thus, this claim of prosecutorial misconduct is waived.

C. IMPERMISSIBLE BASIS ARGUMENT

Jarvis also argues that the State urged the jury to convict him on an impermissible basis when it urged the jurors to convict Jarvis in order to hold him responsible and that this was an appeal to the jury's passion and prejudice. Citing *State v. Anderson*, 153 Wn. App. 417, 220 P.3d 1273 (2009), he compares this argument to arguments asking the jury to "declare the truth," which he asserts also exceeds the scope of the jury's role — "determining whether [the] State proved allegations beyond a reasonable doubt." Am. Br. of Appellant at 49.

First, asking the jury to hold a defendant responsible is more akin to asking the jury to find the defendant guilty, which is permissible. It is not the same as asking the jury to declare the truth, which is akin to telling the jury that its role is to solve the crime and conduct an investigation, and is a misstatement of the jury's true duty of determining whether the State had proved its allegations against the defendant beyond a reasonable doubt. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). Asking the jury to hold a defendant responsible by finding them guilty in no way misstates the jury's duty.

Additionally, Jarvis does not argue or show that this argument, even assuming that it was improper, was so flagrant and ill-intentioned that a curative instruction would have cured any potential prejudice. He argues only that there is a substantial likelihood that the alleged misconduct led the jury to convict on an improper basis. We hold that a curative instruction would have cured any potential prejudice because the superior court could have instructed the jury to disregard any potential improper argument and re-instructed the jury that its purpose was to determine whether

No. 56086-1-II

the State had met its burden to prove all the elements of the charged offenses. Thus, this claim of prosecutorial misconduct is also waived.

## IV. CONSTITUTIONALITY OF POAA

Finally, Jarvis argues that the POAA is (1) unconstitutional because it is administered in a racially disproportionate manner, (2) categorically unconstitutional, and (3) unconstitutional because it violates the proportionality doctrine.

Because we reverse Jarvis' sentences and remand for a full resentencing hearing, we decline to address these issues because Jarvis can now raise these issues at the resentencing hearing.

## CONCLUSION

We hold that Jarvis has demonstrated that he was improperly shackled at his sentencing hearing and that the State fails to establish beyond a reasonable doubt that this improper restraint was harmless. Accordingly, we vacate Jarvis' sentences and remand for resentencing at which he can raise his POAA challenges. We otherwise affirm.

_____
CRUSER, J.

We concur:

_____
LEE, J.

_____
GLASGOW, C.J.